The Honorable, the judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the court is now sitting. God save the United States and this honorable court. All right, good morning. We'll hear the first case, which is Mullen v. Town of Sunset Beach, and Mr. Tarleton, when you're ready, let's go. May it please the court, Raymond Tarleton for plaintiff Shannon Mullen. I've reserved five minutes for rebuttal. Here are the facts that a jury will hear about the Sunset Beach Police Department, satisfying City of Canton deliberate indifference in this court's framework in Carter v. Morris. October of 2017, an on-duty officer pulls over a woman. They are not dating. He lets her go, texts her minutes later to meet up, and he ends up having sex with her in a church parking lot. She reports it, yet no policies drafted and no training. Instead, officers allowed to voluntarily resign, leaving him with a clean record to move on to the next law enforcement agency. A month later, another officer has sex in his patrol car while on duty with his spouse. He's not ashamed, just the opposite. Comes in and brags about it to a detective with the dash camera rolling, sign of a broken culture of bravado on this force. The detective does not report him. Instead, coincidental review of dash cams brings us to light. No policies written, no training conducted. He's allowed to voluntarily resign, freeing him up to move on to the next law enforcement agency. Another time, between 2017 and 19, the police chief did not even remember when it occurred. Third officer in the small force had sex while on duty. No policy enacted, no training. Like the others, he's allowed to voluntarily resign, freeing him up to go on to the next law enforcement agency. Chief Claymore himself recognized the pattern here, and the risk that his officers would engage in sexual... You call it, you call it a pattern. I'm wondering whether a man goes and has an affair or has sex with his wife while on duty, consensual sex, and they're married. And the others were boyfriend and girlfriend and consensually did it. It seems to me your case here involves a form of providing relief from law enforcement in exchange for sex, as sort of a compulsory relationship. And I think that sounds quite a bit different than the two other incidents, which are really questions of whether you're on duty. I mean, what if the guy goes over and plays a poker game in the middle of the day? He would be disciplined for that, too. Or he goes out and plays golf for three hours. I mean, the idea of having sex with your wife in the middle of the day doesn't quite fit the pattern of this case, I don't think. Thank you for the question, Judge Niemeyer. I'd like to take it in two parts. As to his spouse, in and of itself in a vacuum, you could say that it's okay, despite the course of weight of the badge, there's just not coercion there. Importantly, he's bragging about it to another detective. That is fueling a culture of bravado. And you look to JKJ out of the Seventh Circuit to see how that works. And it also identifies a lack of common sense. It's just common sense. You cannot have sex with anyone on duty. And that's Walker versus New York. When there's a lack of common sense, it heightens the need. Demonstrated in the police department, it heightens the need for training and for policies. Two, on their personnel files in the short appendix, as to the two other officers, under all facts in our favor, in the best light, and reasonable inferences drawn in our favor, Anderson versus Liberty Lobby, they're not boyfriend and girlfriend. That's not there. And so it has all of the characteristics of the coercive weight of the badge being used to impair voluntariness in the realm of an officer on duty extracting sexual gratification. That is exactly the type of risk that can escalate into outright predation that happened here. Kramies confirmed in his deposition that he had no training on sexual misconduct by officers and demonstrated no understanding of the differences between engaging in sexual acts as voluntary versus a result of the coercive weight of his badge. Chief Claymore himself, in his deposition, could not point to a single policy that was violated by Officer Kramies. Claymore actually, in his words, describing what is absolutely a pattern, he framed his unethical prior choices by officers, created a slide that superficially sort of touched it on sexual misconduct on duty, especially in the realm of traffic stop detainees or informants, but never gave the training on it. This all fuels the knowledge and obvious risk standards of City of Canton and again implemented by this court in numerous cases, including Carter versus Morris. On these facts, a jury could certainly find that this department had a problem with sexual misconduct by on-duty officers that presented a risk to that the chief and the final policymaker had notice of. Let me ask you, Mr. Talton, in terms of the establishment of a pattern here. You give three different instances of conduct. In each instance, the officers, as I understand, were they taken off of the force? They were allowed to, no reprimand, your honor, they were allowed to voluntarily resign and that ties into an important thing in the JKJ case. But my question is, were they no longer a part of the force? They were no longer part of the South Beach Police Department force. So the question then becomes, because these, unlike the maybe the Second Circuit case or others where you had repeated incidents that are happening before the same guards or repeated things that are happening within the department, as opposed to individual conduct. And you have individual conduct, you know, kind of brings up instances that's come up, for want of a better way to put it, in gun cases, for instance, where it is repeatedly pointed out that this is an individual type of misconduct. And once you get rid of that individual from the department, unless you have something that ties it over to others in there, you understand what I'm saying? Within a department, you can have a deviant. You might even have three or four. And it may not necessarily mean there's something going on in the department, maybe that individual. But the fact that it recurs, of course, is a problem. But how does that, does that sort of change the scenario any that in each instance, as you say, they voluntarily left, and sometimes that's done because they don't want to say they fired you, but the voluntary really isn't voluntary. You know, you're not going to be kept on for instances like this. But that's the question here, because this is a Monell type situation, as I understand. And, you know, trying to establish that for purposes of liability of the police department is different than for the individual, which I understand was settled here. So how do you address that in terms of the individual? Do we look at it collectively, which is what you want us to do, but but why not look at it as though there were three instances, and in each instance, the offending situation was rectified because the officers were removed? It doesn't mean everybody else left was not, you know, couldn't, you know, we're in the same situation. Yes, sir. Yes, Judge Wynn. I think this sort of individual response, we did some sort of punishment and cured the problem. That was one of the defenses raised by the county, Polk County, in the Seventh Circuit, sitting on Bonk and JKJV, Polk County. They said no, that there was a reprimand of a certain nature. They said that is a token response. That is a slap on the wrist. Here, voluntary resignation is even more of a token response. And that becomes known and reinforces the culture that you're going to keep your badge and be able to move on. But even in the Seventh Circuit case, it was not an individual, as I understood, it was more of, it was a known risk of a sexual misconduct that was happening there, that created this what the court called an obvious and known risk of sexual assault. But if it is an individual, in this instance, and that individual has it with another individual, and that person is removed, does that change? Is that different, a difference? Well, I just think the constellation of all the facts we've advanced here shows that there is a fundamental misunderstanding about what the coercive weight of the badge does. The chief himself recognized it. He'd reframed it as unethical choices. But that's training he never gave. Every time he chose not to do training, this is what goes beyond mere oversight, or what might be... Okay, but Mr. Tarleton, what's concerning me about your argument is, it seems like you're trying to aggregate all of the instances of officers who had sex on the job, as opposed to coercive. And since we know that at least two of the three cited instances prior to this case were not coercive, how do you establish a pattern when North Carolina law requires that the employer have some knowledge of the particular type of conduct? It's not just having sex, it's coercing somebody to have sex. Yes, Judge Keenan. Coercion, when sex is occurring on duty, there is an inherent power imbalance. In that scenario, coercion is a question of fact and inference for the jury. Here, we're not talking about weighing evidence at this stage. We're talking about just sufficient evidence to go to the jury. Other than the spouse, that we still say fuels that event between an officer's spouse on duty, that event fueled a broken culture provided. Two others have the optics of exploiting a power imbalance. From there, a jury could infer coerciveness. The Chief Claymore's conclusory characterization that, oh, those were just consensual, the jury isn't bound to accept that. Just like in JKJ, a jury wasn't, as the en banc court said, the Seventh Circuit, a jury wasn't bound or compelled to accept this narrative of just horseplay in the jail, guards just being guards here, officers being officers. That they can find and infer the exploitation of a power imbalance. That is the very constitutional problem that predictably occurred here. It was bound to happen. One of those two other incidences that you're referring to where the people were not married, one of them was a so-called boyfriend-girlfriend relationship, wasn't it? No, it was the ex-girlfriend of another officer. The officer that pulls her over and has sex with her, they're not in a dating relationship. What's telling, her counselor encourages her to go report it to the police. You can infer from that the counselor saw exactly for what it is, the exploitation of a power imbalance. That wasn't boyfriend-girlfriend. She was the ex-girlfriend of another officer, in other words. But that wasn't boyfriend-girlfriend. And the third officer that they didn't even write up a personnel file report on, we have to trust Chief Claymore's memory, all he could tell us in the deposition is it occurred sometime between 2017 and 2019, and just trust me, it's consensual. We don't take an inference in favor of the town on this. The inference in favor of us at this stage is it was somebody that leveraged the coercive way of their badge and impaired the voluntariness of the encounter, and a jury can infer that. It also sets the stage for... Let me understand what you just said. The only evidence was an imperfect recollection that that third incident was consensual. How do you get that to be in any sense? We're looking at a record, right? We are looking at a record. Yes, Your Honor. It would be a competing inference to say that they were in a dating relationship based on that record. He just said his imperfect memory was that, or some assurance that it was consensual, but we have no evidence otherwise. We don't know any more details about it, and my difficulty is just adding to the record a hope that it was coercive. I mean, that's a little bit of a stretch, isn't it? Well, Your Honor, it shouldn't be a stretch. Consent should be understood and well-known, but this department demonstrated... I mean, Cramie's, an officer hired by this department, demonstrated he did not have an understanding of the nuances of consent, especially how it relates to using their bail bond. Well, you know, when they discovered this particular incident, they not only turned it over to the law enforcement, but over to the state authorities and wherever that led, so they recognized that this incident was quite serious, and I think it was a serious failure of the public trust, because the officer clearly exchanged the withholding of traffic tickets for sex, and that really is a compromise of the whole police department, in a sense, but I understand this case is a difficult case. The only question I have is, I understand the prior factual things. I just wonder whether it puts people on notice when the only evidence is the chief says, I thought it was, as I recall, it was consensual, and I think that goes, it may be imperfect, and it may not be hard evidence, but we don't have anything to the contrary, and so that's my only concern about what your argument there. I see I'm out of time. May I give a quick answer? Of course. Yes. His, there, the evidence cuts both ways. Despite him, she claimed our saying is consensual, he also called it unethical. Unethical very well could be referred as irreconcilable as purely consensual, that there was enough notice here under Bunnell and deliberate indifference. Thank you. Okay, thank you. All right, we'll hear now from Mr. Blanchard. Good morning, your honors. Yes, yes, sir. I'm sorry, I was having problems getting on. Good morning, your honors. May I please, may I please the court. I'm Norwood Blanchard, and I'm counsel for the defendant town of Sunset Beach. In short, our contention on this one is that the plaintiff has a complete failure proof on what the required showings that they need to make are. We all agree that the standard here for a failure to train is deliberate indifference, and deliberate indifference is going to require, based on the Supreme Court precedent and the Fourth Circuit precedent, I think we cited Owens for this, generally speaking is going to require multiple instances of demonstrated constitutional violations. And Judge Niemeyer, as you pointed out just a moment ago, and also the questions from Judge Wynn and Judge Keenan, there is no competent evidence in this case. And we challenge them both at the trial court level and in our response brief to point out one shred of competent evidence showing that any of these instances were nonconsensual. And I'll point you to the record. It's at pages 846 to 850 to respond to your questions about whether the evidence showed that this was consensual or not. Those two instances, the instance with the officer's wife, it's at 846 in the joint appendix. As you pointed out, Judge Wynn, the officer was told he was going to be fired, and he resigned. In the next instance, page 848 in the joint appendix, the dating situation, that's the only competent evidence that it was consensual, a dating situation. And page 850 in the joint appendix, he was also told he was going to be fired, and he quit. Now, we know the reason that he went through a pre-termination conference like that, well, they would have a problem with a liberty interest claim, which Judge Wynn is the last thing I had up here in front of you for the bald head matter. So, yes, they called them in to tell them what they were accused of doing and gave them the opportunity to tell their side of the story and told them they were going to be fired. That is not deliberate indifference. Deliberate indifference is putting your head in the hand and condoning it, allowing it to go on. And in every one of these instances where there was sexual misconduct, the officers were shown the door, or in the instance of Clemens, who occurred, again, that wasn't even on duty, that guy after, and it was after he quit, you know, was criminally prosecuted, convicted. In this instance, Judge Niemeyer, as you pointed out, Police Chief Claymore immediately, immediately contacted the proper authorities. The day that he heard about this and spoke to Ms. Mullen, he immediately contacted the State Bureau of Investigation, the DA's office, and training standards. So tell me, is that really helpful? And when you think about it in this light, the imbalance that exists between a citizen of whether the relationship and an on-duty officer, that imbalance is there in terms of whether or not it's consensual or not. It's sort of a conclusion you come to. But the question is, is does this put the town on notice that you have a problem within your department when you have three separate incidents, you know, whether they are consensual or not? But the question is the imbalance, the blurring of that line there. And as I understand it, the problem here, at least that's being alluded to, is that there was nothing, no policy that would be developed that would or had been, nothing was really put forth to change that culture within the department other than, unless you see it as being a deterrent that the person has left, whether it was voluntarily or involuntarily done. But I think the problem here has to do with the imbalance. And the question is the response by the town, would, you know, the change if you would conduct some type of training, that at least officers then would become alert, this is not something you do online. Now, it eludes me as to why this is not just a general part of the training anyway of any officer who becomes an officer, but there are specific instances here that's been pointed to, three of them, before this happened. So is that not, at least in terms of getting a jury question, it can go one way or another, a jury question, could a reasonable jury determine from that, that there was an indifference, a deliberate indifference on the part of the officer? No, Your Honor. Our position, Your Honor, is that a reasonable jury could not, there is literally no evidence of, remember, to get to a jury under Anderson v. Liberty Lobby, the party with the burden of proof has to produce some admissible evidence, some admissible evidence beyond speculation. And there isn't any here. And to your question about what does the department do, the training, they got lessons on that. They were terminated. And, you know, in a situation where you're told that it's consensual, they can't be criminally, I suppose they, in theory, could be criminally prosecuted for some kind of dereliction of duty. But, you know, my police chief took the most severe ability that he had to punish them, which is termination. Oddly enough, looking at the proof on this, you know, we talked a few minutes ago about the deliberate indifference standard and how you have to have that to show that, you know, you're moving force. Again, there's a causation requirement. And the second argument that we made was causation. And this is JA 361, and it's in our brief at page 11. Kramer's sworn deposition testimony was this. If you're talking about a sexual interaction, a relationship with someone while on duty, yes, it's against policy. I violated it. I knew it. So whatever their policy was or wasn't, he certainly believed that what he was doing was violating the policy. He knew it was wrongdoing. The question really goes to the training. Was there training done? And even if one is fired or whether one stays, that's not training. And, you know, the two instances, you mentioned the Ballhead Island case, and it sort of brings to mind, you're kind of in an environment, both Sunset Beach and Ballhead, it's a closed kind of environment you're in there. And you have a police force there. And you become aware of instances within this relatively closed environment that this is happening. And at least the question comes is, are you or should you conduct some training? Maybe? And I don't know, do we look at all police departments as being the same? I'm not sure it follows from that. Yeah, I think you have to look at the context and the location and how they are operative within that area. And how often this occurs, because you would think a little small area like Sunset Beach or Ballhead Island, you wouldn't have this happening over. But when it happens in a small, somewhat, I wouldn't say closed community, but a close knit community, it does raise a question that does, is there not enough for a question of whether there should have been training provided that a reasonable jury could could determine that there was an element of in deliberate indifference? We think not, Your Honor. And to your question about training, I neglected to mention this a few minutes ago, page one of our brief points this out. Officer Kramus had just completed BLET, had just completed BLET right before he started. Now, the North Carolina Administrative Code, I checked it yesterday. It's Title 12, Chapter 9B, I believe. That's 868 hours of training that he had just had. And then he had his on duty training. But that's not good. That's not good. That's general training that I mean, that's like he, that's like he'd gone to church, but let me finish. That's like he'd gone to church and he knew better. And or just generally Mama had taught him, even in the general training. The question goes, when you have a specific area, this is a specific town, and specific instances. This is not something I think that's across the whole state. In fact, I haven't seen cases come up like this too often. And but in this particular area, the question is, is there, was there a duty upon these three instances to at least conduct some level of training? And there may have been, I don't know. But I, but you know, but but could a jury say, yeah, you ought to have done some training on this? And no, Your Honor, we think not, not not on these facts. Now, and again, the reason I say that is that we have the only competent evidence we have on that issue is that Kramas already knew what he was doing was wrong. Right. But he also said, didn't he also say that he had not received any training on this subject? And does that make this a disputed issue of fact? No, Your Honor, we don't we don't believe so. And for that reason, we remember that the general rule here is that you have to have a pattern of instances. You have to show municipal fault. And there is no municipal fault without some showing of constitutional violations, something to let them know, hey, not just that, and I'm to say this crudely, that officers, you know, have hot coals in their pants, but instead that they're out violating people's constitutional rights. And all three of you, that's the reason for the showing of generalized misconduct. And you look at their brief, they've argued that we should be on notice because he drove too fast, because he made a rude comment, by the way, which was well after these incidents, and things like that. He failed a section of BLET exam. Those are things that have absolutely no bearing on a likelihood of violating someone's constitutional rights. And again, those were other officers that had happened two or three years prior, and they were immediately dealt with. I think your argument, your argument then pretty much is that even if we assume that one of the prior instances had an element of coercion, that's not enough to establish deliberate indifference. That's your argument, isn't it? Yes, Your Honor, that's correct. And the reason we say that that's not enough to establish deliberate indifference is that the chief took the most effective remedial action that you can take in that situation, which is to fire the individual. Now, also, Officer Kramas wasn't even there at the time of those instances. That was two or three years prior, so he wouldn't have known about it. There's no indication he knew about it. The only indication that he knew, from the record at least, is that he knew it was wrongdoing, that he knew he was going to be fired. And we cited that in our brief as well. Not only did he know he would be fired, Ms. Mullen acknowledged that she understood it to be true as well. So there's no indication that they allowed this to go on, that they put their head in the sand and took no action in the face of a demonstrated pattern of constitutional violations. Again, the evidence that Mr. Tarleton has put forward, it's speculative in this case, and it doesn't meet the standard of what, say, the Owens case. Your Honor, Judge Winn, you were on the Wilkins v. Montgomery panel that we cited in the brief. In that one, you know, as they pointed out, pointed out in our brief, that there has to be a pattern, a demonstrated pattern to show deliberate indifference. Now, that was actually a supervisory liability case. But let's face it, this is too. This is a type of supervisory liability we're talking about. And, you know, there's been no showing whatsoever that would comply with binding Fourth Circuit precedent or U.S. Supreme Court precedent. If we look at the Board of Commissioners or the Brown case that we cited, the Connick, I'm sorry, Connick v. Thompson, dealt with training, deficient training. And very clearly they pointed out the risk that you have of allowing single instances or scatter shot instances is that you collapse into a situation where you're really proceeding under respondeat superior. And that's all this case is, is an effort to repackage respondeat superior liability as a constitutional violation. It's not even ordinary negligence here, much less deliberate indifference, which is an extremely high standard. Well, you know, fair enough. I mean, I think the question here goes, because this is not a hiring or retention claim. This is a deliberate indifference claim. And so much of what you've talked about might have gone toward a hiring and retention claim. But insofar as deliberate indifference, the issue here is when the plaintiff puts forth evidence that there were three other instances of this conduct that occurred. And the question is, maybe it's a pattern or whatever, but, you know, for the simple firing of the individual is not training. You're not training. And obviously, it's almost obvious, well, must not have made much difference because they kept doing it. And the question then becomes, could a reasonable jury, could a jury determine that based upon the fact that you had three instances there? And even Kramer himself at one point, he says he thought it wasn't a violation if it was consensual. So I'm not sure how much training he got on it. But, you know, aside from that point, the question is still there. Three instances of conduct, whether consensual or not, within a small department in a very closed, in a close-knit community. Does that trigger at least the duty to train? So as you say, get into the causation sort of part of the argument, which I don't think we need to do that. But that's the real question I think we're confronting here. And these cases are difficult because when you start dealing with patterns and policies and practices, you know, most instances, those are things I think that no one's going to deliberately, to use another phrase, not do that. But in this instance, you do have those three instances here. And that's the evidence that's being put up. And the question is whether that should have been training or whether a policy should have been more explicit for that particular entity. And, Your Honor, the issue about training on this, and we go back to this, I know I sound like a broken record on this issue, but you don't, there are two parts to this. You have to prove both that the training was deficient first, some specific deficiency. But what training was done? And, well, they did get some training on it. By the Sunset Police Department? I'm trying to recall, they had the training that the state required. And I'm sorry, I know I covered it in my brief, but it was a brief amount of training that they got in a state required class. And I'm sorry, I can't place that one right now. But the bigger picture for us here is that the lack of training wasn't the moving force. No reasonable juror could conclude that it was the moving And all the cases that we cited with obvious wrongdoing instances stand for that same proposition. Training is not the moving force behind a violation or lack of training, I should say, when everybody knows that it's wrong. Training is for situations, and this was covered in the Connick versus Thompson case. It comes into play in situations where individuals don't know what their obligations are. That's where you need specialized training. Police officers aren't trained, for example, that they shouldn't rob banks on duty, because they know that already. There's no need for that training. And North Carolina's, you know, BLET program that he had just gone through has never been found to be constitutionally deficient that I'm aware of. He had just completed that. He knew what he was doing violated policy. I'm not sure that training, not only am I not, I am sure, training would not have changed this because he knew he was engaging in wrongdoing. That's the only reasonable conclusion a jury could draw to that. Let me ask you, if I understand your argument, the training would have to be, go to a constitutional violation that may not have been appreciated. In other words, the fact that officers take money from the evidence they get, or they use drugs, or they steal while they're on duty, you could never hold the city liable for that because they were not constitutional violations. And the constitutional violations in this case, particular case, was the use of state force, it's law enforcement in exchange for sex. But the question is whether any of those earlier incidents implicated a constitutional level at all so as to put the city on notice of constitutional violations that needed to be addressed. And I believe that's correct, Your Honor. You know, the question was whether they had noticed that there were widespread constitutional violations. That's what the Crowley case, for example, tells us. And I see that I'm out of time. Yeah. All right. Thank you very much. Thank you, Your Honor. Mr. Charlton? You are muted. Thank you, Judge Niemeyer, Judge Winn. I'd like to clear the air with a paper tiger in the room. We have not proceeded on a failure to discipline as a basis claim, nor have we proceeded on a custom through widespread, persisting grain pattern of exactly the same constitutional violations. The central issue here is notice under deliberate indifference, city of Canton versus Harris. But my own point, my last question, and I'd like you maybe to address this. My last question was a respondeat superior may require notice of violations and imputing a liability to the city. But if I understand the Monell doctrine correctly, the city would have to have notice of constitutional violations of such character that would require them to train or to correct the problem within the department. And my question really was whether any of these prior incidents was a constitutional violation or simply an improper ethics violation, improper policing that was involved. Now, I suppose you can infer if you found a lack of consent in any of these earlier ones, you could infer maybe some constitutional issue. But my question is, do you contend that any of these prior incidents rose to the level of constitutional violations? Thank you, Judge Niemeyer. Yes, JA 848 through 849. What my friend on the other side has characterized as dating and unsupported inference. It's not dating. You can look at the personnel file. Officer on duty, you don't pull over people that you're dating. Pulls her over, minutes later texting, meeting up, having sex in a church parking lot. It's nearly one-to-one, if not one-to-one, Your Honor. And City of Canton, sure, you want to look to see if there's been prior constitutional problems within the same dimension within the force. But it's not required. In fact, here, there's another independent grounded notice. And that's Chief Claymore himself saying, I know that there were unethical choices being made. We can translate that. A jury could infer that unethical is a dog whistle for exploiting the course of weight of the badge the exact same way that Claymore frames in his PowerPoint slide about the weight of the badge could be used improperly in the context of traffic stop detainees, like the church parking lot, like how Cramay's predation of Ms. Mullin here started. And also informants, other vulnerable people that male officers may interact with. And so here, it's just, it's, they're relying to try to artificially parse this case back into the realm of respondent superior that there's not a sufficiently analogous constitutional violation. That's just not true. A jury is not compelled to see that church parking lot incident as a dating relationship, just like JKJ, the jury wasn't compelled to see guards being guards in horseplay in the jail. The town has asserted here that officers were fired and terminated. That's not in the record. What's in the record is that they were allowed to voluntarily resign. And there's no evidence in the record that other officers knew why they left. Therefore, this narrative that the town asserts that they were working deterrence through firing people, it's not at all supported by this record. And the jury is, again, certainly free to conclude otherwise, that it was a broken culture fueled by not oversight. That might be the realm of respondent superior, but deliberate inaction, deliberate choice to do nothing repeatedly in the face of this known risk that the chief confessed to knowing. Three, they talk about causation. The district court didn't rule in their favor on causation because it's a quintessential fact question. JKJ does a nice job of laying that out. Importantly, JKJ sitting in Bonk, the Seventh Circuit, says that if you have the highly predictable risk that exists in the deliberate indifference standard, it is only a small logical step to then get to causation. That is, the wholesale deficiencies of policy and training was indeed the moving force behind the violation. If you followed the Seventh Circuit, if you have the very demand... I see I'm out of time. I've quickly finished my point. Sure. If you've satisfied that very demanding standard of deliberate indifference, need for training, that's even more important when there's no written policy, you're invariably going to have sufficiency on causation. Here, a jury would stand on solid evidentiary grounds to see the dormancy by the town as more than oversight, but deliberate inaction. Thank you. Thank you. Thank you both, and we'll take your arguments, good arguments, under advisement and proceed on to the next case. Thank you. Thank you, your honors.
judges: Paul V. Niemeyer, James Andrew Wynn, Barbara Milano Keenan